[No. 2352.]

## ALBERT ROBINSON *v*. THE STATE.

1. PRACTICE—TERM OF THE COURT.—The district court at which this trial was had convened on the day fixed by law, but there being no business before the court for the first week, and the grand jury having been summoned to appear on Monday of the second week, the judge adjourned court until the said second Monday, when the court again convened, and the grand jury was organized and the business of the court proceeded with. *Held*, that the action of the judge in adjourning his court until the second Monday was authorized by law, and the objection to the legality of the term was not well taken.

2. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The death penalty was assessed against the appellant in this case, upon his conviction in the first degree for the murder of his wife, Annie Robinson, in Smith county, Texas, on the twenty-seventh day of April, 1886.

Henry Johnson, the father of the deceased, and the father-in-law of the defendant, was the first witness for the State. The defendant and the deceased were married about a year before the death of the latter, which occurred on the ——— day of April, 1886. They lived at the witness's house from their marriage until the death of the deceased. They had a difficulty about a week before the killing, and the defendant left witness's house and went to work some where else. He came back to witness's house on Sunday, April —. The witness at the time was in his field, and did not know what brought the defendant

to his house or what he wanted. He left and returned about three o'clock on the next evening. Witness, who was again in the field, saw him and went to the house. When witness reached the house defendant said: "Annie is going to leave me." Witness replied: "I didn't put you together and I can't put you apart." Witness then told defendant and deceased to go to town together like a gentleman and a lady, and get an officer to part them; and that, if they would not go for that purpose, he would. Defendant declined the suggestion, and witness went back to his field. He returned about sun down, finding the defendant still on the premises. While the witness was engaged in his yard, shortly after his return from the field, he heard the report of a pistol fired in the house. He entered the house hurriedly at the back door at the very instant that the defendant ran out at the front door. Annie lay partly on a trundle bed and partly on the floor. Witness placed her on the bed, calling her twice by name, to which she answered only: "Sir?" Witness then left in pursuit of the defendant and ran him about one hundred yards, when he escaped through the brush, and was not seen again by the witness until after his arrest, two or three months later. The shot was fired about dusk, and Annie died that night at eleven o'clock. The shot took effect in the head. Annie's baby was about a month old at the time of the killing. Annie left the defendant about a week before her death, because he would not provide for her. Up to that time they had had no trouble; so far as the witness knew.

On his cross examination, the witness testified that he had never objected to defendant and Annie moving away from his house. The defendant promised at his marriage that his wife should always live with the witness and her mother. Witness had never tried to induce Annie to leave the defendant, and had never talked to her about her treatment by the defendant. Witness remembered the visit of Mr. Wilkerson to his place a few days before the killing, to move the defendant and Annie. Witness did not, on that occasion, tell defendant that he could not take Annie away. The witness did not, on that evening, get a hatchet to make defendant leave. Wilkerson drove up to the field fence, and did not go to witness's house. Defendant, after the trouble with his wife, would go off to work during the day and return at night, and witness told him that he did not want him coming to his house creating disturbances. The witness described the construction of his house (which is not important

to this report), and stated that the shooting occurred in a large or front room, into which he entered through a side or shed room when he heard the shooting. The witness was drawing an axe helve on his drawing horse, which was sitting in the yard between the shed room and the kitchen, which was an out house. The witness did not have his axe in his hand when he ran into the big room, nor did he have it on his pursuit of the defendant. No one followed the defendant with an axe that the witness saw. Witness's wife gave up the pursuit before the witness did. She had no axe in her hand. Witness's wife was passing from the kitchen to the shed room when the pistol fired, and at once started in pursuit of the defendant. Deceased was sitting on a bed in the northwest corner of the room when witness last saw her before the shooting. Witness and defendant had no quarrel or hard words on the evening of the killing.

Mary Johnson, the wife of the first witness and the mother of the deceased, testified, for the State, that the defendant came to her house about three o'clock in the evening of the killing and sat around until about sun down, when he asked Annie if she was going to live with him. Annie replied that she was not. He then told her to get his things together, which she did, piling them on a trunk at the foot of her bed. Annie then took a seat on her bed and proceeded to nurse her baby. Defendant, at this time standing in the middle of the floor with one hand in a pocket, said to Annie: "I want whoever raises that baby to have those things; you shall not have them." About this time the witness left the room to go to the kitchen, and left the defendant and the deceased in the positions mentioned. On her way back to the house, the witness heard the report of the pistol. As the witness sprang into the back door, the defendant fled through the front, pursued by witness until he escaped in the brush. When witness returned to the house, Annie was lying on the bed. Her baby was lying on the floor against the wall behind the bed. Charles Buckner and witness's son Robert were in the big room when the fatal shot was fired. Her son Sam was lying on a bed in the adjoining shed room.

On cross examination this witness testified substantially as did her husband on his cross examination, except that she declared that she was not passed by her husband in the pursuit of the defendant, and was the last to give up the pursuit. She ran by the wood pile and got the axe when she started in pursuit.

Witness declared that she had never fomented quarrels between the defendant and deceased.

Charlie Buckner was the next witness for the State. He testified that the defendant came to Henry Johnson's house, where his wife, the deceased, was living, about three o'clock on the fatal evening. Passing in and out of the house he kept up a contention and quarrel all evening. About dusk he came into the big room and asked his wife if she was "of the same opinion still." She replied in the affirmative, and he asked her why she wanted to leave him. She replied: "Because." He then told her to get his things together. She proceeded to do so while he was standing in the middle of the floor. She tore from a quilt she was making the pieces of calico given her by defendant. She piled the things on a box which sat at the foot of the bed, took up her baby, sat down on her bed and proceeded to nurse it. Defendant remarked that, rather than the deceased should have those things, he would see them burned, and before witness could realize his purpose, pulled his pistol, shot the deceased, and fled through the front door, followed by Henry and Mary Johnson, who at the same moment came in at the back door. When shot, Annie fell forward on her face across the trundle bed, which stood in front of the bed on which she was sitting. Witness was sitting in a chair in front of the fire place, with his face towards defendant and Annie, when the fatal shot was fired. Mary ran on through the house after defendant. Henry stopped for a moment and called Annie's name, and she replied: "Sir! Sir!" He then ran out in pursuit of the defendant. Witness next saw defendant at Tobe Brown's place on the day he was placed in custody. He, defendant, and Tobe came to the house together. Witness and Tobe persuaded him that it was best for him to surrender, and accompanied him to town and turned him over to the sheriff.

Cross examined, the witness said that, besides the parties to the tragedy, no one was in the room when it occurred, save himself and little Robert Johnson. Witness was an old man and his eyesight was not good, but he saw all that occurred in the big room, except that he did not see the pistol. He saw the flash and heard the report. Defendant usually kept his pistol in his trunk, and that trunk was open, standing at the foot of the bed, throughout the interview between defendant and deceased. Witness had never known of a quarrel between defendant and deceased, but knew that Henry and Mary Johnson kept up a

constant effort to create difficulties between them. When Henry came from the field that evening and found defendant at the house, he stayed about the house and did not go back to the field. He and defendant engaged in a violent word quarrel in the yard and witness feared for some time that they would terminate their dispute in a club fight. Witness was at Henry's house when Mr. Wilkerson came to move the defendant and his wife. Henry and Mary would not let them go. Mary sat down on defendant's trunks, said that she had bought its contents and that it could not be taken. Witness could not say that Henry had a hatchet in his hand on that occassion, but they certainly had an "uproaring" time about the proposed removal of defendant and Annie. The shot so "flustrated" the witness he did not move from his chair for a long time, and could not say whether or not Henry or Mary had an axe at any time of the pursuit. Neither of them had such a weapon when they passed through the room.

Robert Johnson, the brother of the deceased, testified substantially as did Charlie Buckner, from the entry into the house of defendant, and his inquiry of the deceased if she adhered to her opinion. He saw the pistol as the defendant in his flight, made efforts to put it in his pocket, though it was fired while witness's back was turned.

Cross examined, the witness said that neither his father nor his mother had an axe when they passed through the house in pursuit of defendant. His mother had the axe when she returned from the pursuit. Witness did not know when nor where she got it. No one but witness and Charlie Buckner, defendant and deceased were in the room when the fatal shot was fired, and no one was then attempting to strike defendant with an axe. Witness had often seen defendant's pistol, which was a repeater and not a single shooting pistol.

Sam Johnson, the brother of the deceased, testified, for the State, that he was lying on his bed, in the shed room, when the fatal shot was fired. A few moments before that, Annie came into that room to get some of defendant's things. During the time she was in there, defendant stood at the door with his hand in his pocket.

Cross examined, witness said that, when the shot was fired, his mother passed through the shed room into and through the big room, in pursuit of the defendant, and he followed. His father, Henry Johnson, did not pass through the shed room. Of

this fact the witness was certain, because his father was in pursuit of defendant when witness got out of the house.

Tobe Brown testified, for the State, that defendant came to his house some time after his family had retired, on the fatal night, called to witness and said: "Old man, you had better get up." Witness asked him why. He replied: "Henry's folks will be down here after you in a little while." The witness asked "why they were coming. He replied: "I turned old Arkansaw aloose among them just now, and killed Annie." The witness discrediting his statement, paid no more attention to him, and he left. Witness next saw him in the woods, about three months afterwards. Witness came upon him accidentally. He was sitting on a fallen tree, his pistol and a bottle of whisky lying on the ground in front of him. This sudden meeting frightened witness momentarily. Defendant then saw witness, spoke, and asked if witness did not know him, and if witness was "scared" of him. Witness replied that he was not scared, and went up to and talked with defendant. Witness advised him to surrender, remarking to him: "If you are found here the flies will blow you." Defendant replied that he wanted to go to Henry Johnson's once more, after which he did not care what in the h—ll they did with him. Witness finally prevailed on him to go to his house, and thence to town with him, witness, and Charlie Buckner, who surrendered him to the sheriff.

Cross examined, the witness said that the defendant made no effort to escape, although he could easily have done so, as he had his pistol, and witness was totally unarmed. He had his pistol in his possession until the Whittaker house, a mile from town, was reached, when he gave it to witness and Buckner. The sheriff paid witness and Buckner twenty-five dollars for the delivery of the defendant. Witness had made efforts to secure the one hundred and fifty dollars reward offered by the Governor for defendant's arrest. His chance of securing that reward, the witness supposed, depended upon the result of this trial. The State closed.

——— Brown, the son of the State's witness Tobe Brown, testified, for the defense, that he lived with his father and was at home on the night of the tragedy. Defendant came to Tobe Brown's house before the family retired, and not afterwards, so far as the witness knew. He went, hatless, into the sitting room, said that he had lost his hat and could not find it in the dark, and asked witness to lend him a hat, which the witness did.

Witness did not hear defendant wake Tobe Brown up, or tell him that Henry's folks would be down there, or that he had turned old Arkansaw loose among Henry's folks and killed Annie. Witness did not hear of Annie's death until next day.

Fayette Wilkerson testified, for the defense, that a few days before Annie's death he drove his wagon to Henry Johnson's fence, at defendant's request, to move him and Annie. Defendant went to the house, but witness did not. Witness soon saw Henry Johnson standing in his door, gesticulating towards defendant with a hatchet. Witness was too far to hear what was said. Defendant soon came and told witness that he could not move then, but would get witness another time to move him. He did not say that Henry and Mary Johnson objected to his moving.

The motion for new trial raised the question discussed in the opinion.

*H. B. Marsh* and *C. G. White*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. Defendant's first bill of exception attacks the legality of the term of the court at which his trial and conviction were had. It appears from the bill of exception that the court convened on the day fixed by law for its convening, and, because there was no business to be disposed of by the court that week, and because the grand jury had been summoned to appear on Monday of the second week of the term, the judge adjourned court until the next Monday—that is, until Monday of the second week of the term, at which time the court was again convened, the grand jury organized, and the business before the court proceeded with during the remainder of the term.

In this action of the court we perceive no error. It was within the power of the judge to adjourn his court for the reasons and for the time stated. Such action was not in violation of any law of this State, and did not in any way affect the legality of said term of his court.

II. There are no exceptions to the charge of the court, nor is it in any respect objectionable. It explains to the jury, clearly and correctly, all the law applicable to the facts of the case. Defendant's counsel requested several special charges, which the

court properly refused.   None of these special charges were applicable to or warranted by the evidence.

That the defendant is guilty of murder in the first degree is conclusively established by both direct and circumstantial evidence.   He murdered his wife under circumstances evincing a sedate, deliberate mind, and a formed design to do the act.   It was a most inhuman, cruel and dastardly murder, fully justifying the extreme penalty assessed by the jury.   The judgment is affirmed.

*Affirmed.*